**HENRICKSEN, Acting Collector of Internal Revenue, v. BRAICKS et al.**

No. 10233.

Circuit Court of Appeals, Ninth Circuit.

Aug. 11, 1943.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, A. F. Prescott, Paul R. Russell, and George H. Zeutzius, Sp. Assts. to Atty. Gen., J. Charles Dennis, U. S. Atty., of Tacoma Wash., Thomas R. Winter, Sp. Asst. to Chief Counsel, Bureau of Internal Revenue, of Washington, D. C., and Harry Sager, Asst. U.S. Atty., of Tacoma, Wash., for appellant.

Jones & Bronson, of Seattle, Wash., for appellees.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

This case turns on the question of whether or not a "distribution in liquidation," alleged to have been made to the stockholders of a corporation during a winding-up process that was carried out with the formation of a new corporation in view, amounted to a "taxable dividend paid" entitling the outgoing corporation to a credit under the Revenue Act of 1936.

The appellees brought suit as liquidating trustees of the Pommerelle Company, Inc., hereafter referred to as the old company, to recover $8,338.98, corporation income and excess-profits taxes and interest paid to the appellant. The dividends paid credit claimed by the appellees on behalf of the old company, relates to the alleged distribution of $61,423.39 to its stockholders in 1937.

The old company was organized in 1934 and had its principal place of business in the State of Washington. In September, 1937, the directors decided that the stated value of the corporation's capital stock was too low, with the result that the company was paying excess-profits taxes in an amount larger than its situation required. For the sole purpose of attempting to correct this condition, steps were taken for the liquidation of the corporation. On September 30, 1937, a resolution was passed appointing the appellees as trustees to conduct a voluntary liquidation and dissolution out of court in accordance with the laws of the State of Washington.

According to the minutes introduced in evidence, another corporation, designated as "The Pommerelle Company", hereafter

called the new company, was organized about September 25, 1937, by the stockholders of the old company. The new company was organized prior to the dissolution of the old to prevent any hiatus in the corporate existence that might affect the company's wine and blender's basic permit or its standing with the Federal Alcohol Tax Unit. The minutes indicate that on an unspecified date, the stockholders of the old company subscribed to the stock of the new one in amounts equal in value to their respective shares in the net worth of the old company, as reflected in its balance sheet of October 4, 1937. On September 30, 1937, the stockholders offered to turn over their undivided interests in the assets of the old company, in exchange for the shares of stock in the new company for which they had subscribed.

At a special meeting of the stockholders of the old company, held at 10 a.m., October 4, 1937, the appellees reported that "they had liquidated the assets and affairs of the company by distributing the same to stockholders of record in undivided portions in the amounts set opposite their names." The amounts listed opposite the names of the stockholders aggregated $61,-423.39, which was the excess of assets over liabilities as shown by the statement of October 4, 1937. The stockholders present thereupon voted to approve the report of the trustees and to accept their proportionate shares of the assets of the old company. No bill of sale, deed or other instrument was executed to transfer the corporate assets to the individual stockholders.

On the same day—at 10:30 a.m., according to the minutes—the new company voted to accept the offer of the stockholders of the old company, already referred to, and to purchase the net assets from the stockholders for $61,423.39, which was to be paid "to them by applying the amounts set opposite the names of each individual executing said offer upon the payment of [his] respective subscription for stock in the new company." The trustees then transferred to the new company all the assets held by them for the individual stockholders, and stock was issued to the individuals in the same proportion as their respective interests in the old company.

All but one of the stockholders paid individual taxes upon their shares of the liquidating dividend. Claims for refund

have been filed on behalf of some of the stockholders to protect their interests in case it is held that no taxable distribution was effected.

The Commissioner of Internal Revenue concluded that the steps outlined above amounted to a reorganization of the old company, the taxpayer herein; that in fact no taxable dividend had been paid to the stockholders, and that the corporation was not entitled to a dividends paid credit by reason of the purported distribution. The income and excess-profits tax liability for 1937 having been assessed and paid upon the basis of the Commissioner's determination, a claim for refund was filed, alleging that the Commissioner's action was erroneous in respect of the credit disallowed. The Commissioner having failed to allow the claim, the present suit was instituted.

The court below held that the old company distributed its assets to its stockholders on October 4, 1937, and that the trustees were entitled to a dividends paid credit in reporting the income of the old company for 1937. From that judgment, the present appeal has been taken.

Section 27 of the Revenue Act of 1936, c. 690, 49 Stat. 1648, 1665, 26 U.S.C.A. Int.Rev.Acts, pages 837, 838, deals with "Corporation Credit for Dividends Paid". The pertinent subsections follow:

"(a) *Dividends Paid Credit in General.* For the purposes of this title, the dividends paid credit shall be the amount of dividends paid during the taxable year.

\* \* \* \* \*

"(f) *Distributions in Liquidation.* In the case of amounts distributed in liquidation the part of such distribution which is properly chargeable to the earnings or profits accumulated after February 28, 1913, shall, for the purposes of computing the dividends paid credit under this section, be treated as a taxable dividend paid.

\* \* \* \* \*

"(h) *Nontaxable Distributions.* If any part of a distribution (including stock dividends and stock rights) is not a taxable dividend in the hands of such of the shareholders as are subject to taxation under this title for the period in which the distribution is made, no dividends paid credit shall be allowed with respect to such part."

The appellant contends that the assets of the old company were transferred directly to the new company; that they

were not distributed to the stockholders of the old company as a liquidating dividend; that the steps taken—including the authorization of the distribution in liquidation of the assets of the old company to its stockholders, the preparation of a list showing the pro rata shares of the stockholders in the dividend authorized, and the reporting of the dividends by all but one of the stockholders as income in their respective income tax returns—all were insufficient to effect the distribution contemplated. Moreover, argues the appellant, even if such purported distribution had been accomplished, this would have constituted but one of a series of steps in a plan of reorganization under which it was contemplated that the assets would be immediately passed on to the new corporation organized for the sole purpose of continuing the business.

The appellees, on the other hand, insist that the old company distributed its assets in liquidation to its stockholders, who subsequently and without previous obligation exchanged them for stock in the new company. The appellees also urge, however, that even if the transfer of physical assets was made as the appellant contends—direct from the old company to the new—there was still a liquidation of the old company, entitling it to a dividend paid credit. In our view of the case, it is not necessary to consider this alternative theory advanced by the appellees.

The pivotal point in this case is whether or not there was a real and bona fide distribution in liquidation made to the stockholders of the old company. If there was such an actual distribution—however brief the interval during which each individual stockholder retained title to his share of the assets—then the taxpaying corporation was entitled to a dividends paid credit. If, on the other hand, the purported transfer to the stockholders was a mere "theoretical" and "unnecessary" step in a plan of reorganization—or if, indeed, there was no distribution at all—then the trustees' attempted allocation of assets to the stockholders must be disregarded and the dividends paid credit must be denied.

This is a mixed question of law and fact. We address our attention first to the law governing the functions and powers of liquidating trustees.

Under the general law, liquidating trustees hold the corporation's property for the stockholders. In 16 Fletcher Cyclopedia Corporations, sec. 8195, at page 982, the following language is used: "* * * a corporation ceases to be a going concern and a receiver is appointed, all rights of the corporation vest in the receiver. By the same token, upon the dissolution of a corporation, the corporate entity ceases, the corporation has no power to sue, all rights of the corporation are ended, and the property and funds of the corporation are vested in the trustees for the stockholders."

The Supreme Court of the State of Washington, however, has gone even farther in measuring the interests of stockholders in a dissolved corporation. In Cohen v. L. & G. Inv. Co., 186 Wash. 308, 310, 57 P.2d 1042, that tribunal referred to "the well-established rule that, upon dissolution, the property of a corporation passes to the stockholders, subject to the corporate liabilities."

In the instant case, the minutes of the old corporation show that the trustees reported that they had liquidated the assets and distributed them in proper proportions to the various stockholders, and that the stockholders offered to turn over their undivided interests in the old company in exchange for shares of stock in the new corporation.

The appellant, however seeks to impugn the reliability of the minutes by pointing out certain discrepancies in dates. In this criticism, the appellant himself falls in error in certain particulars, as when he states that the stockholders of the old corporation subscribed for stock in the new on September 28. The appellees, on the other hand, say that the date should be September 30. Neither statement is correct: we have examined both the transcript and the original exhibit and find that the subscription is undated. We advert to these inaccuracies on the part of counsel merely to show how easy it is for errors and omissions to creep in when an attempt it made to record or to criticize the recording of exact dates.

But these discrepancies are the result of honest oversights, and do not affect the substance of the case. There is not a shred of evidence that the minutes were intentionally doctored, nor does the appellant so suggest. In fact, the appellant introduced no testimony or exhibits whatever in the court below. Counsel's skepticism

about the minutes cannot take the place of evidence.

The distribution was not a perfunctory gesture forming a step in reorganization. There is uncontradicted testimony indicating that the liquidation of the old company was not a mere pro forma affair but was subject to the normal uncertainties of corporate action involving the rights of several stockholders of varying interests. Even if this court were not inclined to believe this testimony—on the weight of which we express no opinion—it was apparently believed by the court below, which found that "each stockholder of the old company was notified that he was free to retain or dispose of his interest in the assets of the old company, and to choose whether or not he would enter into the new company." The fact that all the stockholders elected to go into the new company does not militate against their freedom of choice.

Harold L. Scott, the certified public accountant who first suggested the liquidation to the old company's officers, testified as follows regarding the plan:

"I * * * came to the conclusion that the best way to handle the matter would be to liquidate the corporation and if they, all of the stockholders, wanted to go on with the new corporation, they could, or any part of them wanted to withdraw, but insisted they be given that right—there must be a complete liquidation of the old company and if they wanted to subscribe and put in their assets, their undivided portion of those assets into the new corporation, that they must have the right or they could sell them or take them to do anything they saw fit with them.

* * * * *

"And then I carefully explained to each one of the stockholders that were present at this meeting and I believe the larger stockholders were all there, that they would have to pay the tax on their proportionate share, as a liquidation over and above their original cost, and I am sure that there was no question as to [whether] that was clearly understood by those present."

Asked whether there was any discussion as to what would be done in case any stockholder did not want to go into the new corporation, Mr. Scott replied that several of the stockholders, including the appellees, said "they would get together and buy up that share."

August Buschmann, one of the stockholders, testified that "nobody knew at the time of the meeting whether we were going to be in the new corporation or not." "We didn't know who were going to be in the new corporation and who weren't." "We had the privilege of withdrawing if we wanted to, or we had the privilege of staying in, whichever we liked."

J. G. Molz, one of the appellees, who was secretary of the old company, and C. S. Leede, another stockholder, corroborated Buschmann's testimony on this point.

W. Braicks, the other appellee, who was president of the old company, gave detailed and explicit testimony regarding the liberty of action reserved to each stockholder, and the elaborate steps that were taken to buy up the shares of those who might not desire to come into the new corporation. "We told the stockholders what we intended to do and told them also they were at liberty to stay out of the new corporation." "They could sell their shares." "We distributed them [the assets] among the stockholders and they were paid with their assets." "The stockholders subscribed for a certain amount of shares and paid for these shares by assigning or turning over their share of the assets to this new corporation."

Regarding the preparations made to purchase the shares of any stockholders who "didn't want to come in the new corporation", Mr. Braicks testified that he and the other stockholders "bought some in", and that, in addition, he went to the National Bank of Commerce at Seattle, and discussed the matter with Mr. Witherspoon, the vice-president of the bank: "I told Mr. Witherspoon what we intended to do, liquidate the old corporation, form a new corporation; possibly some of the stockholders wouldn't want to go along, wanted to dispose of their share of the assets of the old corporation and asked him, if that should happen, if more than we could handle, whether we can come to the bank and borrow money and do it; he said yes." Later the appellant stipulated that if Mr. Witherspoon and F. W. Wonn, vice president of the new company, had taken the stand, they would have substantially corroborated Mr. Braicks' testimony in this respect.

The appellant can hardly assert that these plans to buy up the shares of stockholders who might not care to subscribe for stock in the new company, were "self-serving"—the adjective that the appellant has applied to the stockholders' action in reporting the receipt of their dividend as taxable income.

Subtle indeed would be the mind that would conceive and execute a plot to have an expert advise the officers of a corporation to inform the stockholders of a liquidating corporation that they have the right to remain out of the proposed new company; to convoke conferences among stockholders as to how money might be raised in order to "buy out" stockholders who did not care to "come in;" and, finally, to arrange trips to the bank for the same purpose—all designed to create plausible "window-dressing" for a later claim for a dividends paid credit by the defunct corporation!

The appellant seeks to brush aside the effect of the voluminous testimony that we have summarized above with a casual footnote pointing out that "no price was fixed in case anyone should have wanted to sell, some of the stockholders did not know to whom to sell, should they want to withdraw, and all understood that the assets of the old company were to be transferred to the new company." In view of the vast inquisitorial resources of the appellant, this seems a somewhat weak rebuttal to the strong and definite showing made by the appellees to the effect that there was an actual distribution to each stockholder, who thereafter could exercise an independent choice as to whether he would or would not go into the new company.

After a careful examination of the record, therefore, we do hold that there is substantial evidence to support the finding of the lower court that "all of the assets of the corporation were transferred to and vested in the plaintiffs as trustees for the stockholders and as liquidating trustees of the company."

Under this state of facts, then, we have to resolve the ultimate question in this case: "Under section 27(f) of the Revenue Act of 1936, is the taxpayer entitled to a dividend paid credit?"

The recent case of Helvering v. Credit Alliance Corporation, 316 U.S. 107, 110-112, 62 S.Ct. 989, 991, 86 L.Ed. 1307, compels an answer in the affirmative. In that decision the following language is used:

"1. Although a distribution in liquidation of earnings which accrued subsequently to February 28, 1913, does not constitute a dividend in the proper sense of the term, subsection (f) categorically declares that a liquidating distribution, to the extent it is composed of such earnings, shall, for the purposes of computing the dividends paid credit 'be treated as a taxable dividend paid.' Plainly the section intends that a distribution of such earnings shall be considered a dividend. Further it provides that the distributing corporation may use the amount in computing its credit for dividends paid. And, to put the matter beyond cavil, the section also says that the distribution shall be treated as the payment to the distributee of a *taxable dividend*.

\* \* \* \* \*

"2. It is urged that the sweeping provision of (h) precludes the application of (f) in the circumstances disclosed, because (h) denies the credit unless the amount distributed is taxable to the distributee. By concession, the distribution here does not result in gain or loss to the parent company. The argument is in effect that (h) creates an exception to the rule formulated by (f).

"As above said, each of the subsections of § 27 deals with a specific and particular topic. Subsection (f) deals with 'distributions in liquidation' while subsection (h) deals with 'nontaxable distributions.' If (f) applies in this case, (h) is left to cover a substantial field of other sorts of distributions. We should, of course, read the two sections as consistent rather than conflicting, if that be possible. Here it is not only possible but begets no absurd or impractical result. We hold that (h) is not applicable to the facts of this case and that (f) is."

So here, it is not a question of whether or not (f) "takes precedence" over (h), as the appellees argue in their brief. It is merely that (f) applies, and (h) does not.

See also Commissioner of Internal Revenue v. Kay Mfg. Corporation, 2 Cir., 122 F.2d 443, certiorari denied, 316 U.S. 680, 62 S.Ct. 1103, 86 L.Ed. 1753; Commissioner of Internal Revenue v. Winchester Repeating Arms Co., 7 Cir., 134 F.2d 6;

Woodward Investment Company v. Commissioner of Internal Revenue, 46 B.T.A. 648, 652.

We hold that the court below was correct in its conclusion that the appellees were entitled to a dividends paid credit in reporting the income of the old company in 1937, and that their right to this credit was not dependent upon whether or not the amount distributed was taxable to the distributees.

Accordingly, the judgment is affirmed.

HANEY, Circuit Judge, did not participate in the consideration or decision of this case.