William **LIDDON**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

Maria Prothro **LIDDON**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

Nos. 12397, 12398.

United States Court of Appeals
Sixth Circuit.

Feb. 11, 1956.

John J. Hooker, Nashville, Tenn. (K. Harlan Dodson, Jr., Walker, Hooker, Keeble, Dodson & Harris, Nashville, Tenn., on the brief), for petitioners.

I. Henry Kutz, Washington, D. C. (H. Brian Holland, Ellis N. Slack, Hilbert P. Zarky, Harry Baum, Washington, D. C., on the brief), for respondent.

Before SIMONS, Chief Judge, McALLISTER and STEWART, Circuit Judges.

STEWART, Circuit Judge.

The sole issue to be determined on this review is whether amounts distributed to the petitioners in 1948 by a closely held corporation were taxable as ordinary income or as a long term capital gain. The Tax Court found that the amounts in question were distributed as "boot" pursuant to a plan of reorganization, having "the effect of the distribution of a taxable dividend" under section 112(c) (2) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 112(c) (2). The petitioners contend the distribution was made in complete liquidation of the corporation and that it should therefore be taxed as a long term capital gain under section 115(c) of the 1939 Code, 26 U.S.C.A. § 115(c). The facts are not in dispute.

The petitioners were husband and wife in 1948. Together they owned eighty per cent of Liddon Motors, Inc., a Tennessee corporation, hereinafter called the "old corporation," engaged in the business of selling and servicing automobiles under a franchise dealer contract with the Pontiac Motor Division of the General Motors Corporation, hereinafter called "Pontiac." The petitioner husband was president and the petitioner wife was vice president of the corporation. The remaining twenty per cent of the stock was owned by R. H. Davis, the general manager of the corporation.

Among other things the franchise agreement provided: "Third: This Agreement constitutes a personal contract, having been entered into in reliance upon and recognition of W. M. Lid-don, R. H. Davis (jointly), the Dealer, or partner(s) in the dealership, or representative(s) of the Dealer who actively and substantially participate(s) in the ownership and/or operation of the dealership. Dealer shall not transfer nor assign this Agreement or any part thereof, nor make nor suffer to be made any substantial change in the ownership, financial interests or active management of Dealer." It was elsewhere provided in the contract that Pontiac could terminate the agreement immediately upon the "Death, incapacity, or the removal, resignation, withdrawal, or elimination from the dealership * * * of * * * any person named in Paragraph Third of this Agreement."

In April of 1948, because of ill health, Davis tendered his resignation as general manager of the corporation, and also notified the petitioners that he wished to sell or liquidate his interest in the corporation as soon as possible. On April 27, 1948, Davis wrote to Pontiac, advising that he had tendered his resignation, that he was "liquidating my stock ownership" and that it was "agreeable with me that in any future contracts between Pontiac Motor Division and Liddon Motors, Inc., or their successors, that I not be considered in Paragraph 3 of the contract."

Special meetings of the shockholders and of the directors of the old corporation were held on April 26, 1948. The minutes of those meetings recite that Davis offered his stock for sale to the other stockholders (petitioners) at book value, but that they did not accept. The minutes further recite that it was after further discussion "concluded by all stockholders that the practical and equitable way to liquidate the stock as requested by Mr. Davis would be to surrender the Charter of the Corporation, selling the assets of the Corporation and liquidating the Corporation at the earliest possible date." Accordingly, the corporation officers were authorized and directed to proceed to liquidate the corporation and surrender its charter, "and sell the assets of the Corporation, calling

the outstanding stock, and distributing the proceeds to the stockholders in their rightful proportion and share."

On May 1, 1948, Liddon Pontiac, Inc., hereinafter called the "new corporation" was incorporated by the petitioners under the laws of Tennessee. Its initial capital consisted of $5,000 contributed by the petitioners in cash, in addition to a $10.00 qualifying share held by a third party. Within three weeks the petitioners contributed an additional $20,000 to the capital of the new corporation. This total contribution of $25,000 was made from the petitioners' personal funds.

On the day of its creation the new corporation entered into a franchise dealer agreement with Pontiac. This new agreement was essentially the same as the previous agreement between Pontiac and the old corporation, except that only the name of W. M. Liddon was entered in "Paragraph Third" of the new agreement, instead of the names of both Liddon and Davis. Pontiac had cancelled the old agreement some time between April 27, the date of Davis' letter, and May 1, the date of the agreement with the new corporation.

On May 6, 1948, at a special meeting of its Board of Directors, the old corporation was directed to sell its operating assets to the new corporation at book value, to permit the new corporation to use the remaining physical assets without charge pending negotiation for their sale, and to transfer its employees' retirement fund to the new corporation. The new corporation accepted this arrangement.

At another special meeting of its Board of Directors, held on July 4, 1948, the old corporation was authorized to pay Davis $11.00 per share for his stock, its approximate book value. On the same day, the old corporation gave Davis its check for $22,000 and his shares were retired. At a subsequent meeting on July 13, 1948, the old corporation was authorized to distribute the balance of its assets to its two remaining stockholders, the petitioners. These assets, consisting of more than $150,000 in cash and notes, were promptly paid over to petitioners in equal shares. Four days later the old corporation surrendered its charter. Each petitioner reported the amount received, less the cost of his old corporation stock, as a long term capital gain for 1948.

The Commissioner asserted a deficiency, claiming that these amounts should have been reported by the petitioners as ordinary income. In a decision reviewed by the full court the Tax Court sustained the Commissioner. 22 T.C. 1220.

Considering the above-described series of transactions as a whole, the Tax Court concluded that they evidenced a plan of reorganization. "The synchronization of these transactions is something more than mere coincidence. It appears to us as a plan of reorganization. And since the liquidation was part of the plan, respondent must be sustained." 22 T.C. at page 1228.

Since the old corporation had transferred part of its assets to the new corporation, and since immediately after the transfer the old corporation's shareholders were in control of the new corporation, the court pointed out that the transaction fell precisely within one of the statutory definitions of a reorganization.[1]

Moreover, since at the beginning of the series of transactions the petitioners held stock in the old corporation, and at the end they held stock in the new corporation, plus "money-to-boot," the court

---

1. Section 112(g) (1) provided in part: "The term 'reorganization' means * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *." Subsection 112(h) provided: "As used in this section the term 'control' means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

reasoned that, although there was not a direct exchange of stock in the old corporation for stock in the new, plus "other property or money," that was the net effect of what was done. Accordingly, the court concluded that the case was governed by sections 112(b) (3) and 112 (c) of the 1939 Code.

 If those sections of the Code control, the result reached by the court was obviously correct, as petitioners in effect concede. Under section 112(b) (3) no gain was recognizable on the "exchange" of stock in the old corporation for stock in the new.[2] The gain resulting from the distribution of the "other property or money," however, since it did not exceed the value of such "other property or money" was recognizable in full by virtue of section 112(c) (1),[3] and since the recognizable gain did not exceed the undistributed earnings and profits of the old corporation, it could properly be taxed as a dividend under section 112(c) (2).[4] Commissioner of Internal Revenue v. Estate of Bedford, 1945, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611.

The Tax Court not only relied upon the fact that one of the statutory definitions of a reorganization had been formally met, but also emphasized the substance of the situation presented, i. e., when the series of transactions was completed the petitioners were in control of the same going business as before, albeit in a new corporate shell, having in the meantime

extracted a substantial portion of the accumulated earnings and profits of the business.

In asking us to reverse the Tax Court's decision the petitioners place prime reliance upon the decision of this court in United States v. Arcade Co., 6 Cir., 1953, 203 F.2d 230. The facts in that case were significantly different, however, as Judge McAllister's opinion in that case makes clear. There, the old corporation was dissolved and its assets distributed to trustees for its stockholders. Thereafter, at the direction of the stockholders, the trustees transferred the assets to a newly formed corporation in return for its stock, which the trustees delivered to the stockholders in shares proportionate to their ownership in the former corporation.

The opinion in the Arcade Co. case emphasizes that the circumstances did not fall within any statutory definition of a reorganization. "It is our conclusion that there was no transfer by the old corporation of its assets to the new corporation, within the meaning of section 112(g) (1); that neither the old nor the new corporation was a 'party to a reorganization', as set forth in section 112 (g) (2); and that the transactions out of which this controversy arose did not constitute a reorganization within the intendment of the Internal Revenue Code." 203 F.2d at page 235. The case of Braicks v. Henricksen, D.C.Wash.

**2.** Section 112(b) (3) of the Internal Revenue Code of 1939 provided: "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

**3.** Section 112(c) (1) provided: "If an exchange would be within the provisions of subsection (b) * * * (3) * * * of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph * * * to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be re-

cognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

**4.** Section 112(c) (2) provided: "If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property."

1942, 43 F.Supp. 254, affirmed 9 Cir., 1943, 137 F.2d 632, also relied upon by petitioners, involved facts almost identical to those in the Arcade Co. case. In the present case, on the other hand, the statutory definition of a reorganization was precisely met. The old corporation's assets were transferred directly to the new corporation, and the petitioners were controlling stockholders of both. Therefore, quite unlike the situation in the Arcade Co. case, each corporation was a "party to a reorganization." [5]

The petitioners contend, however, that where a corporation has been liquidated, as the old corporation in the present case clearly was, the provisions of section 115 (c) of the Code relating to the effect of liquidation distributions must prevail over the previously cited sections relating to reorganizations.[6] It is argued that this court has decided that where there has been a liquidation there can be no reorganization. The argument is based on a statement in the opinion in Mascot Stove Co. v. Commissioner, 6 Cir., 1941, 120 F.2d 153, at page 156—" * * * liquidation is the antithesis of reorganization." What the court was there referring to was liquidation in bankruptcy, as the first part of the sentence from which the quotation was lifted clearly indicates. "In the present case the bankruptcy proceeded to liquidation and liquidation is the antithesis of reorganization." Even a casual reading of the balance of Judge Simons' opinion in that case reveals that what the court there decided was that, since the old corporation was adjudicated a bankrupt, its shareholders had nothing to transfer. "The insolvency of the old company, its adjudication as a bankrupt, and the sale

of all of its assets for less than its debts, put a period to its existence. The new company was a separate enterprise and its realized gains are taxable." 120 F. 2d at page 156.

That liquidation of a corporation may be and often is one of the steps in a plan of reorganization has, on the other hand, frequently been recognized by this and other courts. "Since the exchange was pursuant to a plan of reorganization, the fact that the Fisher Body Corporation was completely liquidated is not controlling." Fisher v. Commissioner, 6 Cir., 1939, 108 F.2d 707, 709. "The so-called liquidating dividend was but a step, albeit an essential one, in the reorganization." Love v. Commissioner, 3 Cir., 1940, 113 F.2d 236, 238. "The liquidation of the old company does not change matters because a statutory reorganization may encompass as one of its incidents the liquidation of one of the corporations a party to the reorganization." Lewis v. Commissioner, 1 Cir., 1949, 176 F.2d 646, 649.

The petitioners' further argument that because Davis' share in the business was completely liquidated during the progress of the transactions, there could be no reorganization within the intendment of the statute, is lacking in merit. It is not unusual in the process of corporate reorganizations for minority shareholders to liquidate their interests and withdraw. "It is our conclusion that the transaction in controversy amounted to a reorganization * * *; and it is unimportant that, in the transaction, a small number consented, or raised no objection to their elimination as stockholders" (citing cases). Seiberling Rubber Co. v. Commissioner, 6 Cir., 1948,

---

5. Section 112(g) (2) of the Internal Revenue Code of 1939 provided that: "The term 'a party to a reorganization' includes a corporation resulting from a reorganization and includes both corporations in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another."

6. Section 115(c) of the Internal Revenue Code of 1939 provided in pertinent part:

"Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112."

169 F.2d 595, 598; "We attach no importance to the fact that some of the stockholders in the transferring corporation acquired no interest in the transferee." Miller v. Commissioner, 6 Cir., 1936, 84 F.2d 415, 418.

■ Moreover, we are of the opinion that the Tax Court was correct in analyzing what was done in this case from the point of view of its overall net effect, rather than to permit one isolated transaction in a series to determine the tax consequences. The tax law, as has been often said, seeks generally to deal with substance rather than form, and particularly is this so in reorganization cases. "Transitory phases of an arrangement frequently are disregarded under these sections of the revenue acts where they add nothing of substance to the completed affair. * * * Here they were no more than intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan." Helvering v. Alabama Asphaltic Limestone Co., 1942, 315 U.S. 179, 184–185, 62 S.Ct. 540, 544, 86 L.Ed. 775. See Seiberling Rubber Co. v. Commissioner, supra, 169 F.2d at page 599; Miller v. Commissioner, 6 Cir., 1939, 103 F.2d 58, 59; Lewis v. Commissioner, supra; Love v. Commissioner, supra.

■ For the reasons expressed we think there was no error in the Tax Court's conclusions, with one important exception. The exception to which we refer is the failure of the Tax Court to give any consideration to the $25,000 contribution which petitioners made from their personal funds to the new corporation prior to the distribution to them of the liquid assets of the old. While it was proper for the Tax Court to determine the tax consequences upon the basis of the unitary effect of all that was done, it was not proper to disregard a significant component part in analyzing the whole.

To the extent of this $25,000 the amount distributed did not have "the effect of the distribution of a taxable dividend;" its effect was the repayment of an advance. Moreover, considering the series of transactions as a whole, the net effect of the $25,000 advance made to the new corporate shell in which the business was to be conducted, prior to the distribution made from the old corporate shell in which the business had been conducted, was *pro tanto*, to reduce the amount of that distribution. The $25,000 stayed in the going business, just as though it had been transferred directly from the old to the new corporation, and as to it no gain was properly recognizable.

For the reasons expressed, the decisions of the Tax Court are reversed and the cases are remanded for further proceedings consistent with this opinion.

McALLISTER, Circuit Judge (dissenting.

I am of the opinion that the transaction whereby the new corporation acquired the assets of the old company was not a reorganization under Section 112(g) of the Internal Revenue Code, Title 26 U.S.C.A. § 112(g).

The old corporation, Liddon Motors, Inc., because of the retirement of General Manager Davis, lost its most important business asset—its franchise dealer contract with the Pontiac Division of General Motors Corporation. There was nothing false, suspicious, or contrived about this situation. The company had originally, in 1936, commenced business as a corporation with William Liddon, Maria Liddon, his wife, and R. H. Davis as the stockholders. Some time later, the business was changed to a partnership with the three stockholders carrying on as partners. Then, in 1946, upon the return of Mr. Liddon from service with the armed forces, the partnership was changed to a corporation with the three partners as stockholders.

The company had started in 1936 with a franchise dealer contract with Pontiac Division of General Motors Corporation. Whenever there was a change from the corporate form to a partnership and then back to a corporation, the officers or part-

ners of the company would be obliged to apply to General Motors for consent to an assignment of the franchise to the succeeding organization, even though the partners were the same persons as the stockholders in the corporation. Moreover, each year, General Motors would call for the surrender of the dealer's contract and issue a new one.

The dealer's franchise contract with General Motors provided:

"* * * this agreement constitutes a personal contract having been entered into in reliance upon and recognition of W. M. Liddon, R. H. Davis, jointly, the dealer or partners in the dealership or representatives of the dealer who actively and substantially participate in the ownership and/or operation of the dealership, dealer shall not transfer nor assign this agreement or any part thereof nor make nor suffer to be made any substantial change in the ownership, financial interest, or active management of the dealer."

R. H. Davis was General Manager of the corporation. He was the man upon whom General Motors relied during the four years' absence of Mr. Liddon while on service with the Army.

The dealer's franchise agreement provided:

"[General Motors Corporation] may terminate this agreement immediately by delivering to dealer or his representative written notice of such termination in the event of the happening of any of the following:

"(a) Death, incapacity or the removal, elimination or resignation from the dealership for any reason of the dealer or any person named in paragraph third of this agreement."

In April of 1948, Mr. Davis had a heart attack. On the urgent advice of his physicians, he was obliged to give up all business connections. On April 26, 1948, he tendered his resignation as General Manager of the company by letters addressed to Mr. Liddon, the President, and to the Pontiac Division of General Motors. Upon receipt of the notice of his resignation, General Motors, in accordance with the contract provisions, immediately cancelled the dealer's franchise contract.

The Liddon Company, on April 26, 1948, the day of Mr. Davis' resignation, held a meeting of the Board of Directors for the purpose of liquidating the company and surrendering its charter. At that time, Mr. Davis offered his stock for sale, but a price could not be agreed upon.

On May 1, 1948, after the liquidation of the old corporation had been determined upon and while it was under way, but before it became completely consummated, a new corporation, Liddon Motors, Inc., was formed, in which William Liddon owned 1,250 shares, Maria Liddon, his wife, owned 1,250 shares, and Oscar Sanders owned one share. This new corporation was formed with $3,000 in cash from Mr. Liddon, $2,000 in cash from Mrs. Liddon, and $10 from Mr. Sanders. It was immediately chartered and undertook to commence business. It had received no assets of any kind from the old company then in process of liquidation. When the new corporation was formed on May 1, 1948, General Motors Corporation issued a dealer's franchise contract to William Liddon, the sole designated individual in the agreement. Later on, May 21, 1948, Mr. and Mrs. Liddon contributed an additional $20,000 of their own money to the new corporation. At that time, none of the assets of the old company had been received by the new company or by Mr. and Mrs. Liddon through sale, transfer, or otherwise. All of the capital in the new corporation—aggregating more than $25,000— was new and had no connection or relationship, directly or indirectly, with the old company.

Prior to the contribution of the last $20,000 to the new corporation by Mr. and Mrs. Liddon, the Board of Directors of the old corporation directed sale of its operating assets to the new corporation at book value, and agreed to permit

the new corporation to use the remaining physical assets without charge, pending negotiation for their sale, as well as directing the transfer of its employees' retirement fund to the new corporation.

The government emphasizes the above directions of the old corporation as to the sale of its assets and the transfer of the employees' retirement fund, but I fail to perceive how this affects the case. The old corporation certainly was able to receive more for its assets from the new corporation than it could from anyone else, as a considerable amount of it was concerned with such a dealership; and the transfer of the employees' retirement fund might result in some security for the old employees and be an inducement to them to work for the new company, but beyond that consideration, I fail to see that this is a factor to be considered in arriving at the conclusion that the transaction amounted to a reorganization within the meaning of the statute.

The new corporation, on June 4, 1948, purchased a quantity of the assets of the old company. It was an outright sale. Mr. Davis never recovered his health and never resumed any business association. The old corporation finally paid him $11 per share for his stock, which was the same value it would have had upon final liquidation. It also paid off its bills and liquidated its accounts receivable during the first three months that the new corporation was operated, and, finally, it was completely liquidated.

It appears to me that the Commissioner has failed to establish that there was a reorganization within the intendment of the statute.

The new corporation was an entirely different entity. The stockholders were different, although the difference in shares between the stockholders in the old corporation and in the new company would not, in itself, prevent the transaction from being found to be a reorganization. But the new company was formed with new money. It had a new dealer's franchise contract. It bought out the assets of the old corporation, paying cash to that company.

There was no way in which the old company could transfer its most important asset to the new company, since the dealer's franchise contract depended entirely upon the action of General Motors Corporation; and, according to its terms, the franchise of the old company had come to an end with the retirement of Mr. Davis. The testimony in the record shows that the new franchise was issued by General Motors because Mr. Liddon, as an individual, was able to fulfill the financial and other requirements exacted. There was no way that he could have secured such a contract except by complying with the requirements prescribed by General Motors and justifying the faith that that company had in his personal ability and integrity. It might be said that General Motors would have, in any event, awarded the dealership to Mr. Liddon, if he desired it, and qualified for it, and continued to engage in the business of selling cars. That may be so. But the choice was theirs, and not his, and it was a valuable asset, and they might have, as has happened in similar situations, awarded it to someone else. When General Motors issued the new and different dealer's franchise contract, it was an asset that could not have been secured from the old company on any terms.

If General Motors had refused the new corporation the dealer's franchise contract, or if the new corporation had secured a dealer's franchise contract from a company other than General Motors, it is admitted that the claim that the new company was merely a reorganized corporation could not be maintained. I am unable to see any difference in the situation where the contract with the old company had been cancelled and the sole power to grant such a contract to the new company lay entirely in the discretion of General Motors Corporation. For that seems clearly to disclose that the new company was not a mere continuation of the old one; and the fact that the new company bought the assets of the old company with new capital does not, in my view, lead to the conclusion that

**312**

the transaction was only a transfer of property from the one corporation to a newly organized company, which, in effect, was the same. In my opinion, the decision of the Tax Court should be reversed.