Allied Stores Corporation v. Commissioner.Allied Stores Corp. v. CommissionerDocket No. 63341.United States Tax CourtT.C. Memo 1960-209; 1960 Tax Ct. Memo LEXIS 86; 19 T.C.M. (CCH) 1149; T.C.M. (RIA) 60209; September 30, 1960*86 1. Taxpayer corporation caused the liquidation of an unprofitable subsidiary which was indebted to it in an amount in excess of the value of the debtor subsidiary's net assets, applied those assets at their fair value to the partial payment of the indebtedness, and sold those assets to another subsidiary for a price not less than their value and payable solely in money. Held, these transactions, considered either separately or as a whole, did not contain or constitute an exchange as to which any subsection of section 112, I.R.C. 1939, provides that no gain or loss shall be recognized, even assuming the transactions constituted a "reorganization" as defined in section 112(g)(1)(D). 2. Held, the distribution of net assets to parent corporation by debtor subsidiary in partial payment of its debt to parent was not a liquidating distribution in cancellation or redemption of stock and therefore section 112(b)(6), I.R.C. 1939, is not applicable. 3. Held, advances made to subsidiary by taxpayer corporation constituted bona fide indebtedness and not capital contributions. 4. Held, (a) subsidiary corporation at time of its liquidation and transfer of its assets had no valuable goodwill; *87 (b) the leases held by subsidiary were burdensome and of no value; and (c) the net value of its other assets was not in excess of the book value thereof. Percy W. Phillips, Esq., Southern Building, Washington, D.C., for the petitioner. Emil Sebetic, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent determined a deficiency in Federal income tax of the petitioner for the fiscal year ended January 31, 1950, in the amount of $1,019,900.69, not all of which is in controversy herein. The deficiency resulted in part from the respondent's determination "that you have failed to establish that the amount of $1,014,345.20 allegedly due from The Rollman and Sons Company, constitutes a proper bad debt deduction" and, further, with respect to a loss from sale or exchange of property other than capital assets, "that the loss claimed in the amount of $2,214,565.92 based on the alleged worthlessness of The Rollman and Sons Company capital stock is not an allowable deduction * * *." Pursuant to certain stipulated adjustments, petitioner now concedes that the claimed bad debt is reduced to the amount of $881,100.85 and the basis of the stock involved is reduced to the amount of $1,866,163.52. The issues presented for decision are whether*89 respondent erred (1) in disallowing a deduction of $881,100.85 as a worthless debt, (2) in disallowing a deduction of $1,866,163.52 as a loss on worthless stock, and (3), in the alternative, if it be decided herein that petitioner's advances to The Rollman & Sons Company did not constitute an indebtedness, whether respondent erred in failing to reduce taxable income reported by petitioner as interest received from such company in the amount of $224,815 during the taxable year. Findings of Fact Some of the facts have been stipulated and are so found. We incorporate herein by this reference the stipulation of facts and exhibits attached thereto and identified therein. Allied Stores Corporation (hereinafter sometimes referred to as petitioner) is a Delaware corporation with principal office at 401 Fifth Avenue, New York, New York. It was organized in 1928 and carried on business under the name of Hahn Department Stores, Inc., until May 29, 1935, when it adopted its present name. At all times material herein petitioner kept its books and records and filed its Federal income tax returns on the accrual basis with its taxable years ending on January 31 of each year. Petitioner's return*90 for the taxable year ended January 31, 1950, involved herein, was filed with the then collector of internal revenue for the Upper Manhattan District of New York. Petitioner was organized to acquire a nationwide chain of department stores which had been previously owned and operated independently of each other. Under its charter petitioner has broad powers including the power to operate all branches of the department store business and to hold the stock of other corporations. Since shortly after petitioner's organization, its stock has been publicly held and has been listed and traded on the New York Stock Exchange. Petitioner's largest stockholder owns approximately 3 per cent of its stock. On December 8, 1928, petitioner's board of directors adopted a resolution authorizing the issuance of $23,000,000 in aggregate par value of 6 1/2 per cent convertible preferred stock and 1,284,000 shares of common stock in connection with its acquisition of the common stock of 22 corporations. On or about January 7, 1929, petitioner acquired all the outstanding capital stock (other than preferred stock to be redeemed) of 22 companies, each of which was independently engaged in the operation*91 of one or more department stores. Thereafter all of the department stores controlled by petitioner continued to operate under their own names and under the direction of the same managements as before their acquisition. Petitioner's central organization devoted itself primarily to the coordination of the activities of all the department stores with respect to the management, the buying activities, the development of more effective merchandising methods, the sound expansion of the chain, and the financing of the entire operation. On January 11, 1929, petitioner's board of directors adopted a resolution whereby, to facilitate the credit of each of the subsidiaries in respect to its contracts, petitioner assumed liability for the discharge of all valid contract obligations thereafter created by its subsidiaries. Certified copies of such resolution were filed with Bradstreet Company and with R. G. Dun & Co., nationally known firms furnishing credit information throughout the United States. Such resolution has never been rescinded or recalled and copies have been furnished when requested by those who sold goods to petitioner or its subsidiary corporations. The Rollman & Sons Company (hereinafter*92 referred to as Rollman) was one of the 22 corporations petitioner acquired control of in January 1929. Rollman was organized under the laws of Ohio in 1900, succeeding to a business previously established in 1867. Since 1901 and at all times material herein during its existence Rollman owned and operated a department store in Cincinnati, Ohio. Prior to petitioner's acquisition of Rollman's common stock and for the fiscal years ended January 31, 1926 to 1928 and the 8-month period ended September 30, 1928, Rollman's net profits after taxes but before adjustment by respondent amounted to $406,912.97 for 1926, $493,354.19 for 1927, $499,266.40 for 1928, and $177,776.50 for the period February 1 to September 30, 1928. At the time of petitioner's acquisition of all the common stock of Rollman the issued and outstanding capital stock of Rollman consisted of 200,000 shares of no par value common stock with a declared value of $1,000,000 and 15,000 shares of $100 par value 6 per cent cumulative preferred stock, callable on 90 days' notice at $105 per share and accrued dividends. During 1928 and prior years Rollman had occupied its business premises partly on property which it owned in fee*93 and partly on property occupied under ground leases which had been executed in prior years and were renewable forever. The leasehold and building site were valued at $1,460,000 by Rollman's board of directors on June 27, 1927, on which date the board declared a dividend of $1,460,000 in the preferred stock of Rollman. The balance sheet of Rollman as of September 30, 1928, before adjustment by respondent and briefly stated in round figures, was as follows: ASSETSCash or equivalent$ 146,714Accounts Receivable (net of reserve)378,548Inventory (net of reserve)1,105,491Real Estate not used in operations (Hotel property leasehold,599,993net of unpaid balance)Notes Receivable1,600Stocks owned1,100Buildings (subject to mortgage),net after depreciation1,130,310Furniture, Fixtures and Equipment, net after depreciation220,920Delivery Equipment, net after depreciation11,344Office Fixtures, net after depreciation16,456Leasehold of Store Bldg., site avalue as established by1,460,000managementDeferred assets and Prepayments29,786$5,102,262LIABILITIESNotes Payable (bank loans)$ 25,000Accounts Payable444,952Accrued taxes, interest, rentals118,090Purchase money mortgage600,000Capital & Surplus6% Preferred Stock1,500,000Common Stock1,000,000Surplus1,414,220$5,102,262*94 The contract under which petitioner acquired control of Rollman provided that real estate and leases were to be excluded from Rollman's assets. Accordingly, during 1928 Rollman organized a subsidiary corporation known as The Alaska Realty Company (hereinafter referred to as Alaska) to which it transferred all of its interest in its real estate, fixtures, and equipment in exchange for all the capital stock of Alaska. On or about January 4, 1929, the stock of Alaska was transferred by Rollman to its then stockholders, the Rollman family, and petitioner has never owned any of the capital stock of Alaska. On or about January 4, 1929, Alaska, as lessor, and Rollman, as lessee, entered into two leases. The first lease covered the property used by Rollman in the operation of its department store, together with all store fixtures, furniture, and equipment therein, and called for a rental of $390,000 annually. The second lease covered property used in Rollman's business as a garage and called for a rental of $10,000 annually. Both leases were for a term of 99 years renewable forever. As required by the provisions of both leases and under date of January 7, 1929, petitioner executed agreements*95 of guaranty to Alaska for the full and faithful performance of all terms, conditions, and convenants of those leases by Rollman, its successors and assigns. On December 31, 1928, Rollman's board of directors adopted a resolution authorizing Rollman to borrow from petitioner the sum of $1,597,500 for the purpose of redeeming Rollman's outstanding preferred stock on April 1, 1929, and further authorizing the execution of Rollman's promissory note for such amount payable to the order of petitioner on demand on or after January 15, 1929. Also on December 31, 1928, Rollman's board of directors adopted a resolution calling for redemption on April 1, 1929, all of the outstanding preferred stock of Rollman at $105 per share plus accrued and unpaid dividends to said date of redemption amounting in all to $106.50 per share. On January 2, 1929, petitioner's board of directors adopted a resolution that petitioner loan to Rollman the sum of $1,597,500 for the purpose of providing Rollman with funds for the redemption of its outstanding preferred stock on April 1, 1929, such loan to be made against Rollman's promissory note payable to the order of petitioner on demand on or after January 15, 1929, with*96 interest at the rate of 5 1/2 per cent per annum. Also on January 2, 1929, petitioner's board of directors adopted a resolution that, for the purpose of providing funds for its loan to Rollman, the petitioner borrow from the New York Trust Company the sum of $1,597,500 against the promissory note of Rollman payable to petitioner in such amount, such loan from the New York Trust Company to be payable on or after January 7, 1929, and on or before January 15, 1929, on one day's notice with interest at 5 1/2 per cent per annum. During 1928 and 1929 Rollman redeemed all of its issued and outstanding preferred stock at a total cost to it of $1,597,500. On or about January 7, 1929, petitioner acquired at a cost to it of $2,214,565.92 all of the outstanding common stock of Rollman and after the latter's redemption of its preferred stock petitioner was the sole owner of all of Rollman's outstanding capital stock at all times material thereafter. The comparative balance sheets of Rollman, before adjustment by respondent, as of the close of the fiscal year ended January 31, 1929 (subsequent to its transfer of certain assets to Alaska and petitioner's acquisition of Rollman's outstanding common*97 stock), and also the fiscal year ended January 31, 1930, were as follows: Year EndedYear EndedAssets1/31/291/31/30Cash$ 91,528.90$ 39,080.79Notes & Accts. Receivable512,039.11546,670.47Less: Res. for baddebts16,254.207,315.51Net$ 495,784.91$ 539,354.96Inventories$ 860,663.52$ 722,050.30Investments: Stocks-Domes. Corp.101,659.72100.00Capital Assets: Furniture & Fixtures14,132.9614,632.73Delivery Equipment31,292.8319,464.44Improvements to Leased Prop.1,084.39106,475.34Total$ 46,510,18$ 140,572.51Less: Res. for Deprec.20,827.7017,219.09Net$ 25,682.48$ 123,353.42Goodwill$1,460,000.00$1,460,000.00Other Assets44,355.1244,646.22Deposit Trustee-Preferred Stock Redemption1,034,722.29Total Assets$4,114,396.94$2,928,585.69LiabilitiesAccounts Payable$ 269,605.72$ 279,118.47Accrued Expenses85,047.0155,289.42Due Allied StoresCorp.1,597,500.001,546,515.59Fed. Income Tax Reserve8,631.68Capital stock: Preferred Stock965,700.00Common Stock1,000,000.001,000,000.00Earned Surplus196,544.2139,030.53Total Liabilities$4,114,396.94$2,928,585.69*98 During the taxable years ended January 31, 1932 through 1934, petitioner and its subsidiary companies filed consolidated income tax returns upon which losses of Rollman to the extent of $348,402.40 served to reduce the taxable income of petitioner and, by reason thereof, the original cost basis of $2,214,565.92 to petitioner of all the common stock of Rollman was adjusted to the reduced amount of $1,866,163.52. During the period from January 7, 1929, to October 31, 1949, petitioner made payments of cash to Rollman and paid certain of Rollman's obligations all of which it charged on its books and records to an account receivable from Rollman. During the same period petitioner received payments of cash from Rollman and collected certain amounts for the benefit of Rollman all of which it credited on its books and records to such account receivable from Rollman. Rollman on its books and records maintained a corresponding account payable to petitioner in which it also recorded all items of cash or of credit between it and petitioner. At all times material herein, at the close of each month, petitioner furnished Rollman with a statement showing the balance of the account at the beginning*99 of the month, of all charges and credits made during the month, and of the balance at the end of the month. Such statement also computed separately interest upon the balances. Rollman was charged with interest for the month upon the balance at the beginning of the month and with interest on any cash payments to it during the month from the date of the payment. Rollman was credited with interest on any cash payments to petitioner from the date of such payment to the end of the month. The net amount of the interest for the month was paid by check from Rollman to petitioner, except for the fiscal years ended January 31, 1940 and 1941 for which no payment was made by Rollman. Rollman deducted the amounts accrued and/or paid to petitioner as interest during the period from January 7, 1929, to October 31, 1949, on its Federal tax returns; and such amounts were included as interest in the taxable income of petitioner in its Federal tax returns covering said period and Federal income taxes were paid thereon, except that on its Federal income tax returns for the taxable years ended January 31, 1940 and 1941 petitioner did not report as taxable income any amounts as interest received from*100 Rollman, for the reason that petitioner did not receive any actual payment from Rollman for such amounts in those years. However, by audit in 1942, respondent determined that such amounts constituted taxable income to petitioner for those years on the ground that such amounts had been claimed as deductions for Federal tax purposes by Rollman and that because of improved business conditions such amounts were in fact collectible. Petitioner did not dispute respondent's determination and paid the taxes assessed by reason thereof. With respect to the fiscal years ended January 31, 1929 through 1949 and the period February 1 to October 31, 1949, inclusive, the year-end balance in the intercompany account between petitioner and Rollman, the annual increase (or decrease) in such intercompany account, and the annual interest paid on account by Rollman to petitioner, were as follows: Increase (or De-crease) in In-Interest PaidIntercompanytercompanyon AccountYear EndedAccountAccountby Rollman1/31/29$1,597,500.001/31/301,546,515.59$ (50,984.41)$ 88,560.921/31/311,396,309.33(150,206.26)78,148.631/31/321,381,603.73(14,705.60)68,164.931/31/331,704,360.89322,757.1679,199.861/31/342,257,654.67553,293.78103,246.791/31/352,391,258.40133,603.7313,757.891/31/362,695,513.31304,254.9127,261.451/31/372,876,031.54180,518.2326,144.301/31/382,705,662.46(170,369.08)7,932.291/31/393,064,085.96358,423.507,087.541/31/401,149,591.3085,505.347,967.671/31/413,497,246.25347,654.958,531.371/31/423,784,997.24287,750.99175,284.391/31/433,356,000.70(428,996.54)197,972.071/31/443,152,762.12(203,238.58)162,914.001/31/452,887,896.44(264,865.68)156,548.001/31/462,940,922.0353,025.59148,592.001/31/474,874,912.891,933,990.86189,176.001/31/485,883,800.891,008,888.00270,490.001/31/496,049,067.71165,266.82309,410.0010/31/496,170,881.82121,814.11224,915.00*101 Rollman's net sales, total income, total deductions, and net profit (or loss) before deduction for loss carryovers, before Federal income taxes, and before adjustment by respondent, for the fiscal years ended January 31, 1929 through 1949, and the period February 1 to October 31, 1949 (in the dollar amounts with cents omitted), were as follows: Net Profit(or Loss)Before LossYear EndedTotalCarryoversJan. 31Net SalesTotal IncomeDeductionsor Fed. Taxes1929$ 1,171,882$ 411,088$ 334,986$ 76,10119306,276,7822,036,9721,945,76991,20219315,292,0521,913,3111,865,63647,67419324,373,0591,588,9691,699,829(110,859)19333,667,4391,107,3551,552,747(445,391)19344,073,1911,398,1251,655,067(256,942)19354,407,0001,521,3001,631,200(109,900)19364,347,6001,526,2001,659,300(133,100)19374,504,9741,713,6801,787,558(73,877)19384,836,4611,891,3281,885,7455,58219394,035,3811,498,5201,728,519(229,999)19404,254,8561,582,8721,688,317(105,444)19414,524,6551,743,3351,734,6418,69319425,407,8032,062,5482,051,89310,65519436,140,9002,345,6732,186,489159,18419446,698,1192,551,8082,295,890255,91719457,733,9312,976,4022,457,573518,82819468,539,2503,202,6382,617,606585,032194710,528,4323,737,0413,247,323489,717194811,709,1173,936,7613,819,549117,212194912,142,2204,257,3534,005,537251,8162/1 to7,285,8242,576,1592,746,345(170,185)10/31/49*102 The comparative balance sheets of Rollman as of the close of the respective fiscal years ended January 31, 1946 through 1949, and as of October 31, 1949, are as follows: Assets19461947Cash$ 74,384.26$ 149,363.16Notes & Accts. Rec.540,747.39926,899.99Less: Res. bad debt14,656.1930,121.68Net526,091.20896,778.31Inventories909,201.741,658,387.95Investments: U.S. Securities450,690.0055,942.50Stocks - Dom. Corp.1,752.001,752.00Capital Assets: Furn. & Fix.343,013.51805,964.65Delivery Equip.1,797.876,879.39Improv. Leased Prop.100,862.651,207,235.85Total445,674.032,020,079.89Less: Res. Deprec.182,313.97257,338.61Net263,360.061,762,741.28Goodwill1,460,000.001,460,000.00Other Assets113,118.50117,996.71Total Assets$3,798,597.76$6,102,961.91LiabilitiesAccounts Payable$ 277,243.22$ 509,101.30Notes Payable2,665,000.00 1Accrued Expenses215,069.36217,742.79Due Allied Stores275,922.03 14,874,912.89Fed. Income Tax Res.414,000.00192,500.00Surplus Reserves: Unearned IncomeContingencies17,527.9618,967.72Capital Stock: Common Stock1,000,000.001,000,000.00Earned Surplus(1,066,164.81)(770,262.79)Total Liabilities$3,798,597.76$6,102,961.91*103 October 31,Assets194819491949Cash$ 74,301.25$ 89,445.68$ 64,840.21Notes & Accts. Rec.1,285,331.741,873,503.771,961,808.76Less: Res. bad debt40,661.24103,413.89129,063.01Net1,244,670.501,770,089.881,832,745.75Inventories1,600,087.251,583,076.811,660,436.92Investments: U.S. SecuritiesStocks - Dom. Corp.1,752.001,752.001,752.00Capital Assets: Furn. & Fix.1,107,106.771,094,929.231,085,227.29Delivery Equip.16,756.2916,756.2916,756.29Improv. Leased Prop.1,653,180.831,663,826.341,657,142.83Total2,777,043.892,775,511.862,759,126.41Less: Res. Deprec.412,396.22578,224.06688,026.35Net2,364,647.672,197,287.802,071.100.06Goodwill1,460,000.001,460,000.001,460,000.00Other Assets115,739.97135,553.43114,992.45Total Assets$6,861,198.64$7,237,205.60$7,205,869.39LiabilitiesAccounts Payable$ 365,827.16$ 384,579.78$ 553,820.33Notes PayableAccrued Expenses219,788.82201,798.77100,447.93Due Allied Stores5,883,800.896,049,067.716,172,893.81 2Fed. Income Tax Res.48,400.0081,500.0020,178.50Surplus Reserves: Unearned Income40,404.6261,459.02Contingencies28,569.98Capital Stock: Common Stock1,000,000.001,000,000.001,000,000.00Earned Surplus(685,188.21)(520,145.28)(702,932.20)Total Liabilities$6,861,198.64$7,237,205.60$7,205,867.39*104 The intercompany account receivable from Rollman was opened on petitioner's books in the amount of its initial advance of $1,597,500 to Rollman in January 1929, which was for Rollman's use in redemption of its preferred stock. Rollman had theretofore earned substantial profits and such advance was made with the expectation of repayment in full. Rollman made repayments to petitioner totaling $215,896.27 during the fiscal years ended January 31, 1930, 1931, and 1932. Thereafter during the succeeding fiscal years involved herein, except for 1947 and 1948 hereinafter mentioned, the advances by petitioner to Rollman as reflected by the increases in the intercompany account, were made primarily to finance Rollman's inventory and customer accounts receivable. Those advances were made necessary by some increase in sales volume and by an increasing*105 business in household appliances sold on long-term deferred payment accounts receivable and also, during the 1940's, by steady increases in price levels for inventory merchandise. Rollman made repayments on the intercompany account at such times as it had funds available for that purpose. Rollman never paid any dividends to petitioner. Beginning with the fiscal year ended January 31, 1932, and for several years thereafter, Rollman sustained operating net losses. In the fiscal year ended January 31, 1941, Rollman began to earn profits. For the fiscal years ended January 31, 1945 and 1946 Rollman's net profits amounted to $518,828.89 and $585,032.04, respectively (before loss carryovers, Federal income taxes, and adjustment by respondent), and the volume of business for the store was near its full capacity. Petitioner's management decided it was time to modernize and expand Rollman's plant facilities as a longrange program, including the modernization of Rollman's principal store building located at Fifth and Vine Streets, and the conversion of its annex building, located across an alley at Opera Place and Vine Street, for use as store space. On July 8, 1946, Rollman leased the*106 basement, first, second, and third floors of a building located several city blocks away from its principal store building, for use in its business as a warehouse. The original 2-year term of the lease was extended for a further period of 2 years to July 31, 1950, at a monthly rental of $150 per month. For the fiscal years ended January 31, 1947 and 1948, petitioner's advances to Rollman in the amounts of $1,933,990.86 and $1,008,888, respectively, as reflected by the increase in the intercompany account for each of those years, were used primarily to expand and improve Rollman's facilities and, in part, for increased inventories and customer accounts receivable. The cost of modernization and expansion of selling facilites, additional merchandise inventories acquired, and financing increased customer accounts receivable for the fiscal years ended January 31, 1947 and 1948, due to the improvement program of Rollman, were as follows: 1/31/471/31/48Building Improvements to Leased Property$ 618,486.68$ 215,486.69Building Equipment Improvements to Leased264,806.01171,441.54PropertyElevators and Escalators158,638.2126,177.50Air Conditioning - System65,495.1035,235.81Air Conditioning Operating Equipment67,482.2428,982.63Store and Office Operating Equipment63,426.5625,545.96Store and Office Furniture and Fixtures253,176.97218,320.86Floor Coverings85,051.9319,461.71Total$1,576,563.70$ 740,652.70Merchandise Inventories - Increased749,186.21Accounts Receivable - Increased370,687.11347,892.19Total Amount Spent$2,696,437.02$1,088,544.89*107 Petitioner's advances to Rollman on an open intercompany account were made in the same manner as petitioner's advances to its various subsidiaries for similar purposes, including modernization programs carried out by several of petitioner's other subsidiaries at about the same time as Rollman's program. Rollman's modernization and expansion program carried out during the fiscal years ended January 31, 1947 and 1948, did not result in the anticipated increase in net profits. Instead, Rollman's net profits for each of the fiscal years ended January 31, 1947 to 1949, inclusive, were less than for the fiscal year ended January 31, 1946. At sometime during the period February 1 to October 31, 1949, Rollman began operating at a loss. The improvement program did result in an increase in Rollman's volume of sales, but such increase was not in proportion to the increased operating costs of the additional floor area, merchandise inventory, interest charges, etc., attributable to such program. Rollman's business, along with the general economy of Cincinnati, was adversely affected by a decline during 1948 and 1949 of Cincinnati's machine tool industry which was one of the city's largest industries. *108 Throughout the existence of petitioner, one of its operating policies has been to finance the operations of its subsidiary companies. Petitioner guaranteed the contract obligations and general trade accounts of all its subsidiaries, and also advanced to them any additional funds needed from time to time for business purposes, instead of their borrowing from local banks or otherwise. Petitioner could borrow in the open-money market at a lower rate of interest than its individual subsidiaries could obtain. The interest rate charged by petitioner on advances to its subsidiaries was normally higher than that paid by petitioner on its borrowings. The greater part of petitioner's borrowings was on a long-term basis while its subsidiaries made repayments to petitioner whenever they had available cash. Petitioner's indebtedness for borrowed capital (excluding certain debenture notes issued to stockholders as dividends upon capital stock) stated at the close of the fiscal years ended January 31, 1948, 1949, and 1950 amounted to $25,000,000, $24,250,000, and $23,500,000, respectively, on its promissory notes bearing 3 1/8 per cent interest. In addition and for the purpose of financing inventories*109 and accounts receivable for the peak spring and Christmas seasons, petitioner customarily made short-term borrowings of several million dollars which were repaid during the year and not reflected on a year-end statement. In the department store business it is customary for the year-end inventory to be lower and cash to be greater than for other periods of the year, due to the seasonal character of department store sales. Petitioner's advances to Rollman constituted a bona fide indebtedness and not capital contributions. Through the years petitioner continued to expand its operations by acquiring additional department store companies through acquisition of stock or by acquiring suitable department store properties and organizing corporations to operate them. During the early part of its fiscal year ended January 31, 1950, petitioner wholly owned 38 subsidiaries, including the following 4 companies operating department stores in Ohio: Rollman, located in Cincinnati; Morehouse-Martens Company (hereinafter called Morehouse), located in Columbus; The Fashion, located across an alley from Morehouse in Columbus; The A. Polsky Company (hereinafter called Polsky), located in Akron; and*110 Allied Stores of Ohio, Inc. (hereinafter called Allied of Ohio), located in Cleveland. Allied of Ohio was incorporated under the laws of Ohio on or about October 11, 1947, as a wholly-owned subsidiary of petitioner. It was organized under the name of Allind Company. In 1947 it purchased for cash the assets of The Lindner Coy Company, which operated a department store in Cleveland, Ohio, and on or about November 14, 1947, changed its name to The Lindner Company. During 1947 and 1949 it acquired the net assets of 4 other companies, all of which operated department stores in Ohio, and sometime after October 31, 1949, its present name was adopted. All operations of Allied of Ohio have been conducted in Ohio. During the fiscal year ended January 31, 1950, and sometime prior to September 12, 1949, petitioner's executive officers decided that the Rollman intercompany account receivable looked doubtful and, further, that petitioner should make demand for payment of such account and proceed to collect as much thereof as possible. Petitioner's president investigated the possibility of finding an outside purchaser of Rollman but without success. Petitioner's executive officers did not*111 consider that it was good business policy for petitioner itself to conduct business in Ohio. They did decide that all of its Ohio subsidiary companies operating separate department stores should be integrated into one company thereby providing centralized management of the several stores, and they selected Allied of Ohio to become the integrated company. In connection therewith consideration was given to the matter of the best plan under which the integration should be carried out and of the resulting effect taxwise. Thereafter, during the latter part of its fiscal year ended January 31, 1950, petitioner's plan of integration of its Ohio department store subsidiaries was carried out pursuant to a series of resolutions adopted by the board of directors of each of the several corporations involved. On September 12, 1949, the petitioner's board of directors adopted several resolutions which provided, in part: 1. That it was thereby determined to be in the best interest of petitioner in order to realize the maximum amount from its intercompany account receivable from Rollman, that petitioner accept from Rollman "at net book value to that Company in partial payment of the obligation*112 of said Company" to petitioner with respect to such intercompany account receivable, all the property and assets subject to the liabilities of Rollman, except that its real estate leases were neither accepted nor assumed, and, further, 2. That petitioner sell to Allied of Ohio "at book value, the property and assets, subject to the liabilities" of Rollman "as same are received by this Corporation in partial payment and discharge of the latter company's account" with petitioner. On September 30, 1949, the board of directors of Allied of Ohio adopted several resolutions which provided, in part: 1. That Allied of Ohio purchase from petitioner, at book value, the property and assets subject to the liabilities of Rollman and accept assignment of and assume all contracts and agreements pertaining to the business operations of Rollman, and, further, 2. That Allied of Ohio accept assignment from Rollman of the latter's interest as lessee under 2 yeases from Alaska, as lessor, for terms of 99 years from October 1, 1928, renewable forever, and a lease dated July 8, 1946, from Amelia Schreiber, et al., as lessor, for a term expiring July 31, 1950, and assume all of the covenants and obligations*113 of the lessee under each said lease, and, further, 3. That Allied of Ohio accept from petitioner, owner of all of its outstanding capital stock, as and when tendered the donation as a capital contribution to it of the property and assets subject to the liabilities of Morehouse, The Fashion, and Polsky, and that Allied of Ohio assume all contracts and leases pertaining to the business operations of said companies. On October 26, 1949, Rollman's board of directors and stockholders (petitioner being its sole stockholder) held a meeting in the New York office of petitioner and adopted several resolutions which provided, in part: 1. That Rollman assign and transfer to Allied of Ohio all of its right, title, and interest as lessee in and to its real estate leases with Alaska and Amelia Schreiber, et al., subject to the assumption by Allied of Ohio of all of the liabilities and obligations of Rollman as lessee under such leases, and, further, 2. That Rollman assign, transfer, and convey to petitioner "in partial payment of the obligations" of Rollman to petitioner in respect of the intercompany "loan and interest accounts due" to petitioner, all of the property and assets, subject*114 to the liabilities, other than rights, liabilities, and obligations under real estate leases, of Rollman at October 31, 1949, at the net book value thereof. On October 29, 1949, Allied of Ohio executed an assumption of leases whereby it agreed with Alaska to assume the covenants and obligations of the lessee under Rollman's real estate leases, as to which petitioner had previously executed an agreement of guaranty to Alaska for the full and faithful performance of all terms thereof by Rollman and its assigns. On October 31, 1949, Rollman executed assignments of its real estate leases to Allied of Ohio and the latter executed acceptances thereof. These leases were burdensome to the lessee and had no fair market value. On October 31, 1949, Rollman executed to petitioner, conditioned upon petitioner's assumption of its liabilities, an assignment of all its properties and assets of every kind, including, inter alia, cash, receivables, inventories, furniture, fixtures, rolling stock, improvements to leased property, "goodwill, right to use of the name 'The Rollman & Sons Company'," and all contractual rights, but excluding any real estate leasehold interests. On October 31, 1949, petitioner*115 executed an assumption of all of Rollman's liabilities, obligations, contracts, and agreements, excluding real estate leases. As of October 31, 1949, the goodwill and right to use the name "The Rollman & Sons Company" had no fair market value. On October 31, 1949, petitioner executed an assignment of all of the property and assets subject to the liabilities acquired by it from Rollman to Allied of Ohio in consideration of a sum equal to the net book value of such assets and the latter's assumption of liabilities. On the same date Allied of Ohio executed an assumption of all of the liabilities, obligations, contracts, and agreements which petitioner had assumed under its assumption of the liabilities of Rollman. The operating loss statement of Rollman for the period February 1 to October 31, 1949, as shown by its Federal income tax return, reported an operating net loss in the amount of $170,185.95. Respondent adjusted the operating net loss to be in the amount of $10,789.48, resulting primarily from an adjustment for Rollman's inventory as of October 31, 1949. Paragraph 35 of the stipulation herein is a detailed explanation of 8 columns of data on Joint Exhibit 18-R which*116 sets forth Rollman's assets and liabilities, excluding amounts due petitioner and excluding capital stock and deficit, as shown on Rollman's balance sheet as of October 31, 1949; the various adjustments made thereto by Rollman, by petitioner, and by respondent, respectively; and the results of such adjustments. It is stipulated that petitioner "accepts" the adjustments made by respondent and further stipulated that "respondent does not concede that the fair market value of the Rollman assets, either individually or in the aggregate as a going business, was not greater than as set forth in column (8)" showing the results of respondent's adjustments. The data shown in columns (1), (3), (5), and (8) of Joint Exhibit 18-R, pertaining to Rollman's assets and liabilities as above mentioned, are as follows: (1)(3)(5)(8)After RollmanAfteradjustment1-31-50adjust-for inventoryments bypeti-As perandtioner andpetitionerusedRollmanadjustmentin computingAfter ad-badbalance sheetfordebtjustments byeliminationreductionon 10-31-49of goodwillas per itsrespondentreturnAssetsCash$ 64,840.21$ 64,840.21$ 64,840.21$ 64,840.21Notes & Accts. Rec.1,961,808.761,961,808.761,961,808.761,961,808.76Less Reserve for Bad129,063.01129,063.01129,063.01129,063.01Debts$1,832,745.75$1,832,745.75$1,832,745.75$1,832,745.75Mdse. Inventories$1,660,436.92$1,622,278.92$1,797,023.92$1,797,023.92Stock Domestic Corps.1,752.001,752.001,752.001,851.00Furn. & Fixtures1,085,227.291,085,227.291,085,227.29Delivery Equipment16,756.2916,756.2916,756.29Improvements to1,657,142.831,657,142.831,657,142.83Leased Property$2,759,126.41$2,759,126.41$2,759,126.412,858,337.33Less Reserve for Dep.688,026.35688,026.35688,026.35744,250.36$2,071,100.06$2,071,100.06$2,071,100.06$2,114,068.97Deferred Charges$ 25,294.45$ 25,294.45$ 25,294.45$ 25,294.45Sundry Receivables89,309.8289,309.82101,309.82127,437.94Improve. in Process388.18388.18388.18388.18Goodwill Writings1,460,000.00Total Assets$7,205,867.39$5,707,709.39$5,894,454.39$5,963,668.42Liabilities AssumedAccounts Payable$ 553,820.33$ 553,820.33$ 553,820.33$ 553,820.33Accrued Expenses100,447.93100,447.93100,447.9399,888.62Federal Income Taxes20,178.5020,178.5020,178.5020,178.50Unearned Income61,459.0261,459.0261,459.02$ 735,905.78$ 735,905.78$ 735,905.78$ 673,887.45Net assets recorded$6,469,961.61$4,971,803.61$5,158,548.61$5,289,780.97as being receivedfrom RollmanDue from Rollman6,172,893.816,170,881.82Bad Debt deducted on$1,014,345.20Return$ 881,100.85*117 Petitioner first recorded on its books and records as of October 31, 1949, a credit in its account receivable from Rollman in the amount of $4,971,803.61, the net difference between the stated value of the Rollman assets, excluding goodwill, in excess of the liabilities assumed by petitioner, as representing the purchase price from Rollman of such net assets. Thereafter various adjusting entries were made, as above mentioned, and based upon respondent's adjustments petitioner made adjusting entries on its books and records as of October 31, 1949, to show its purchase price of the net assets of Rollman to be $5,289,780.97. The fair market value of those net assets was not in excess of that amount. Petitioner first recorded on its books and records as of October 31, 1949, in an account receivable from Allied of Ohio the amount of $4,971,803.61 as representing the sale price to Allied of Ohio of such Rollman net assets. Thereafter petitioner made adjustments to its account receivable from Allied of Ohio in a manner consistent with the adjustments mentioned in the next preceding paragraph. After such adjusting entries as of October 31, 1949, petitioner's books and records show the*118 sale price to Allied of Ohio of Rollman's net assets to be $5,228,321.95 which represents the figure of $5,289,780.97 less an item of $61,459.02 unearned income treated by the parties as a liability assumed by Allied of Ohio. Allied of Ohio, on its books and records as of October 31, 1949, first recorded the receipt from petitioner of the Rollman assets and liabilities, and also recorded its account payable to petitioner in the amount of $4,971,803.61. Thereafter Allied of Ohio, on its books and records, made adjustments to the stated value of the Rollman assets in a manner consistent with the above-mentioned adjustments made by petitioner. The balance sheet as of October 31, 1949, of Allied of Ohio before and after the transfer to it of the Rollman assets and liabilities as adjusted shows an increase in the amount of $5,963,668.42 in the assets and liabilities, respectively, of Allied of Ohio. During the latter part of October 1949, petitioner transferred to Allied of Ohio as a capital contribution all the property and assets subject to the liabilities, including assumption of contracts and leases of petitioner's subsidiary companies, Morehouse, The Fashion, and Polsky, respectively. *119 On and after October 31, 1949, at all times material herein and without interruption, Allied of Ohio carried on the operation of a department store business under the name The Rollman & Sons Company, in the same premises at the same location, initially using the same properties subject to the same liabilities, the same employees, and the same store manager as had been used by Rollman in its operation of a department store on and before October 31, 1949. The comparative profit and loss statement of The Rollman & Sons Company, the Cincinnati branch of Allied of Ohio, for the period November 1, 1949, to January 31, 1950, and for the fiscal years ended January 31, 1951 through 1958, before adjustment by respondent, shows that its net sales, total income, total deductions, and net profit (or loss), were as follows: FiscalTotalNet ProfitYearNet SalesTotal IncomeDeductions(or Loss)11-1-49 to 1-31-50$ 3,233,748.06$1,131,211.52$1,066,257.14$ 64,954.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,557,133.583,887,745.643,845,373.4042,372.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,355,291.383,571,687.173,818,715.04(247,027.87)1-31-5310,995,035.844,025,087.223,891,773.56133,313.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,099,200.394,075,922.254,058,342.0217,580.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,196,124.583,706,168.554,077,921.12(371,752.57)1-31-5610,143,155.553,636,175.634,015,278.65(379,103.02)1-31-5710,935,857.333,972,631.234,649,981.48(677,350.25)1-31-5811,922,860.274,137,411.175,078,113.54(940,702.37)*120 During the period from its organization in October of 1947 through the fiscal year ended January 31, 1958, petitioner made payments of cash to Allied of Ohio and paid certain of Allied of Ohio's obligations, received payments of cash from Allied of Ohio, and collected certain amounts for the benefit of Allied of Ohio, which payments, receipts, charges, and credits were recorded on their respective books and records by petitioner as an account receivable from Allied of Ohio, and by Allied of Ohio as an account payable to petitioner, in a manner similar to that described with respect to petitioner and Rollman. Monthly statements of principal charges and credits and interest charges and credits were also sent by petitioner to Allied of Ohio in a manner similar to that described with respect to petitioner and Rollman. The net amount of the interest for each month was paid by check from Allied of Ohio to petitioner. Allied of Ohio deducted the amounts accrued and/or paid to petitioner as interest during the period from its organization in October of 1947 to January 31, 1958, on its Federal income tax returns and such amounts were included as interest in the taxable income of petitioner*121 in its Federal income tax returns covering said period and Federal income taxes were paid thereon. The intercompany account between Allied of Ohio and petitioner showed the amount of $11,273,794.13 due to petitioner as of October 31, 1949, including the amount of $5,228,321.95 due to petitioner as representing the adjusted purchase price to Allied of Ohio for the above-mentioned Rollman net assets. Allied of Ohio paid to petitioner the entire amount of such intercompany account during its fiscal years ended January 31, 1950 through 1958. Allied of Ohio and Rollman, respectively, kept their books and records and filed their tax returns upon the accrual basis of accounting and upon the basis of fiscal years ending on January 31 of each year. During the taxable fiscal year ended January 31, 1950, the petitioner sustained a bad debt loss of $881,100.85 and a worthless stock loss of $1,866,163.52. Opinion KERN, Judge: The issues presented in this proceeding are whether respondent erred in disallowing the petitioner, for the taxable fiscal year ended January 31, 1950, (1) a bad debt deduction of $881,100.85 under section 23(k)(1)1 claimed as an indebtedness due from petitioner's*122 subsidiary, Rollman, which became worthless during that year, and (2) a loss deduction of $1,866,163.52 under section 23(g) claimed as a loss on the capital stock of Rollman which became worthless during that year. The respondent's primary contention (which he says is dispositive of the case) is that the liquidation and sale transactions should be disregarded as transitory steps in a series of transactions whereby in effect the business of Rollman was transferred to Allied of Ohio, which when viewed as a whole should be considered as constituting in substance "a tax-free reorganization under section 112(g)(1)(D), thereby requiring the nonrecognition to petitioner of any gain or loss." This section 2 merely defines the term "reorganization;" it does not itself carve out any exception to the general rule stated in section 112(a) that "[upon] the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter*123 provided in this section." Those exceptions are specified in other parts of section 112, particularly the various subsections of section 112(b). *124 Therefore, even if we assume, contrary to the vigorous argument of petitioner, that there is a reorganization within the definition of section 112(g)(1)(D) in that there was "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred," it is necessary for us to determine that some other subsection of section 112 provides that "[no] gain or loss shall be recognized" by reason of the facts described in our findings. Briefly stated, those facts are as follows: 3 Petitioner owned all of the stock of Rollman, a corporation operating a department store in Cincinnati, Ohio; petitioner's basis with regard to this stock was approximately $1,800,000; Rollman owed petitioner approximately $6,100,000; in 1949 Rollman began operating at a loss in spite of large sums spent in modernization and expansion and in increasing its inventory; in its fiscal year 1950 petitioner determined that its account receivable from Rollman was of doubtful collectibility and decided to collect what it could on it; petitioner, being unable to*125 find an outside purchaser and being unwilling itself to carry on business in Ohio, decided to and did take over the assets of Rollman (excluding its burdensome leases) at a figure not less than their net fair market value (approximately $5,200,000) as a payment in this amount on its account receivable and then sell these assets for the same amount to its wholly-owned subsidiary, Allied of Ohio, which owned and operated profitably several stores in Ohio and to which petitioner caused Rollman to transfer its burdensome lease having no fair market value solely in return for the assumption by Allied of Ohio of the obligations under these leases; during its 8 fiscal years ended January 31, 1958, Allied of Ohio operated the business consisting of the assets and leases formerly owned by Rollman at an average annual loss of approximately $300,000, and yet by reason of its profitable operation of other stores which it owned was able to pay off by the end of that period the amount of the purchase price of Rollman's assets. Thus, as a result of the transactions here in question, *126 petitioner which had a stock investment in Rollman and an account receivable from that company of approximately $6,100,000 ended with an account receivable against Allied of Ohio, another of its subsidiary corporations, in the approximate amount of $5,200,000, Rollman ended with nothing, and Allied of Ohio ended with Rollman's assets for which it owed petitioner an account payable in an amount not less than their fair market value. Respondent has cited a number of cases 4 supporting his argument that the transactions referred to above and described in our findings should be considered together as a whole and as so considered constitute a reorganization as defined in section 112(g)(1)(D). However those cases involved transactions which either as a whole or in their component steps constituted directly or in substance exchanges as to which some subsection of section 112 (other than section 112(g)(1)(D)) provided that no gain or loss shall be recognized. *127 The instant case may be summarized as one in which a corporation decided to liquidate an unprofitable subsidiary which is indebted to it in an amount in excess of the value of its net assets and apply those assets to the partial payment of the debt, and at the same time decided to sell those assets to another subsidiary for a price not less than their value and payable solely in money. We fail to find in this situation any exchange as to which any subsection of section 112 provides that no gain or loss shall be recognized. See Iron Fireman Manufacturing Co., 5 T.C. 452, in which the facts were essentially similar to those in the instant case except that the transfer of assets was directly from subsidiary A (the original debtor) to subsidiary B with the payment therefor going from subsidiary B to the parent corporation. In the alternative and predicated on the assumption that the Rollman liquidation is a separate and closed transaction for tax purposes, the respondent contends that petitioner is not entitled to the claimed bad debt deduction or loss deduction on worthless stock because of failure to establish that the advances to Rollman were loans rather than capital*128 contributions and, further, if there was a debt, failure to establish that the fair market value of the Rollman net assets was in such amount as to show worthlessness of the debt and/or the capital stock of Rollman. Further, in the alternative, respondent contends that by reason of petitioner's failure to prove the existence of any indebtedness and also the fair market value of the net assets of Rollman, it must be concluded that the liquidation of Rollman was all, or in part, in exchange for Rollman's capital stock which constituted a distribution in complete liquidation of a subsidiary corporation within the meaning of section 112(b)(6), thereby requiring the nonrecognition of any gain or loss to petitioner. These alternative contentions are disposed of adversely to respondent by our conclusions hereinafter set forth relative to the bad debt and worthless stock issues. Based on a thorough consideration of the entire record herein we conclude and have so found that all of petitioner's advances to its subsidiary, Rollman, over a period of years constituted a bona fide indebtedness which amounted to $6,170,881.82 on October 31, 1949, rather than capital contributions; that the net*129 assets of Rollman were transferred to petitioner in partial payment of Rollman's indebtedness on October 31, 1949, and had a fair market value not in excess of $5,289,780.97 on that date, which left an unpaid balance of $881,100.85 of such indebtedness which became worthless at that time; that petitioner made a bona fide sale of the Rollman net assets to Allied of Ohio for a full and adequate consideration of a specified sum of money which was subsequently paid; and further that upon the complete liquidation of Rollman it had nothing left of any value to distribute in cancellation or redemption of its capital stock which had an adjusted cost basis to petitioner of $1,866,163.52 and which became worthless at that time. In our opinion, the preponderance of the evidence of record clearly establishes the foregoing conclusions and findings of ultimate facts. The petitioner's cash advances to its subsidiary, Rollman, were made in the same manner as its advances to its various other subsidiaries in the regular course of petitioner's established method of doing business over a long period of years. Petitioner's advances to Rollman were made as loans regularly recorded in the intercompany*130 accounts of both parties as an account receivable by petitioner and an account payable by Rollman with the intention of both parties that they would be repaid. Over a long period of years interest was charged by petitioner and paid or accrued by Rollman and treated as a deduction by Rollman and as income by petitioner. Furthermore, throughout the years the respondent has consistently not only acquiesced but insisted that the advances constituted loans and that petitioner include interest thereon in its taxable income. For the taxable year involved herein the amount of $224,815 interest on the Rollman intercompany account has been included in petitioner's taxable income as finally determined by respondent. The record herein as to the business history of petitioner and Rollman, including the balance sheets and profit and loss statements of Rollman and the uncontradicted testimony, convinces us that the advances were not intended by the parties to be capital contributions but were intended to be loans. The uncontradicted testimony herein supported by the documentary evidence establishes that the fair market value of the net assets of Rollman on October 31, 1949, was not in excess*131 of $5,289,780.97 viewed separately and in the aggregate on the basis of a going-concern value of the Rollman business and, in our opinion, represents an optimum valuation. The record herein does not support respondent's contention of failure of proof of fair market value because in arriving at the above amount the item of goodwill theretofore carried as an asset on the Rollman books was excluded as having no fair market value. In view of the continuing substantial deficits over a long period of years in the operations of Rollman and positive testimony on this point, we conclude that Rollman did not possess any goodwill which had any fair market value on October 31, 1949. The Rollman 99-year real estate leases from Alaska, which were transferred by Rollman to Allied of Ohio in consideration of the latter's assumption of the liabilities of the lessee thereunder, had no fair market value on October 31, 1949, even on the basis of the continued use of the premises by the Rollman store under the ownership of Allied of Ohio, but instead constituted a liability. The uncontradicted testimony of well qualified witnesses supported by documentary evidence establishes to our satisfaction that*132 the Rollman leases were without value and constituted a definite liability on October 31, 1949. The leases were executed in 1929 and still had a long term to run at an excessively high rental in comparison with the October 31, 1949, fair market value of the property itself and the surrounding properties, and also in comparison with other rentals in that area. The transfer of the real estate leases to Allied of Ohio by Rollman in connection with the liquidation in no way lessened the value of Rollman's net assets transferred to petitioner in partial payment of Rollman's indebtedness to petitioner. We have determined that petitioner was a bona fide creditor as well as a stockholder of Rollman on October 31, 1949, when as a creditor petitioner received all of the net assets of Rollman which had any value in partial payment of the indebtedness, leaving the balance due a worthless debt. After this was done Rollman had no assets which it could distribute in liquidation to petitioner as its stockholder. Section 112(b)(6) provides that "[no] gain or loss shall be recognized upon the receipt by*133 a corporation of property distributed in complete liquidation of another corporation, * * *" and further provides at considerable length the circumstances under which a distribution is to be regarded as in complete liquidation. However, under section 112(b)(6)(D) the distribution must be "in complete cancellation or redemption" of all of the stock. Petitioner received no property from Rollman as its stockholder. We have heretofore held in numerous cases, which are controlling here, that section 112(b)(6) was not intended to and does not cover a sale or transfer of assets to a creditor. H. G. Hill Stores, Inc., 44 B.T.A. 1182; Glenmore Distilleries Co., 47 B.T.A. 213; B. F. Sturtevant Co., 47 B.T.A. 464; Iron Fireman Manufacturing Co., supra; and Spaulding Bakeries, Inc., 27 T.C. 684, affd. 252 F. 2d 693. Accordingly, we hold that respondent erred in disallowing petitioner a bad debt deduction of $881,100.85 and a worthless stock loss deduction of $1,866,163.52 for the taxable fiscal year ended January 31, 1950. Decision will be entered under Rule 50. Footnotes1. These sums total $2,940,922.03 which is the amount of the intercompany account as of the close of the fiscal year ended January 31, 1946, as shown on Joint Exhibit 7-G. SEC. 112. RECOGNITION OF GAIN OR LOSS. (g) Definition of Reorganization. * * * (1) The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, or (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, or (E) a recapitalization, or (F) a mere change in identity, form, or place of organization, however effected.2↩ No explanation is given as to the difference between this figure and the amount of $6,170,881.82 intercompany account as of October 31, 1949, as shown on Joint Exhibit 7-G.1. All sections referred to herein are sections of the Internal Revenue Code of 1939, as amended.↩3. Our conclusions as to values and the character of petitioner's advances are explained later in this opinion.↩4. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179; Liddon v. Commissioner, 230 F. 2d 304, reversing 22 T.C. 1220 on another issue; Walter S. Heller, 2 T.C. 371, affd. 147 F. 2d 376, certiorari denied 325 U.S. 868; Richard H. Survaunt, 5 T.C. 665, affd. 162 F. 2d 753; Bard-Parker, Inc., 18 T.C. 1255, affd, 218 F. 2d 52, certiorari denied 349 U.S. 906; Pebble Springs Distilling Co., 23 T.C. 196, affd. 231 F. 2d 288, certiorari denied 352 U.S. 836; and Ethel K. Lesser, 26 T.C. 306↩.